**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PATTY C. WILSON, Individually and | : | No. 4:14-cv-00771 |
| as Administratrix of the Estate of | : | |
| Jerry Wilson, Deceased, | : | (Judge Brann) |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| TA OPERATING, LLC, and | : | |
| TRESTON WESLEY HARRIS, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

**February 13, 2017**

## I.   BACKGROUND

On a fateful October afternoon in 2011, tractor trailer driver Jerry Wilson was traveling along Interstate 80 East in Clinton County, Pennsylvania when his front brakes caught fire. Mr. Wilson extinguished the flames and guided his rig to the nearest service center, TA Operating, LLC, in Lamar.

The primary technician who serviced the truck, Treston Wesley Harris, knew about the recent blaze. In fact, Mr. Wilson also purchased a new fire extinguisher from the establishment. Thereafter, Mr. Harris purportedly repaired Mr. Wilson's brakes, sent him on his way, and the trucker soon got back on the road again.

Just minutes later and about fifteen miles east of the repair shop, Mr. Wilson's brakes caught fire once more. At that time, nearly 7:00 in the evening and on a desolate stretch of highway, Mr. Wilson pulled his tractor trailer onto the shoulder and deployed his fire extinguisher. When it failed to quench the flames, he attempted to use a jug of water from his truck's cabin.

What makes this case truly uncommon and exceptionally tragic, however, is what happened next. In the heat of the moment, Mr. Wilson's heart stopped beating, and he died at that spot alongside the roadway. The first passersby to witness the scene discovered an unresponsive Mr. Wilson lying on the ground with an empty water container still clutched in his hand.

I have spoken in prior decisions as to the thorny causal issues this case presents. Today, however, the sole determination before the Court is whether the Defendants' conduct exhibited the kind of recklessness for which a reasonable jury could award the Plaintiff punitive damages. Applying prevailing Pennsylvania law, I believe that the answer is yes.

Despite the presumption that punitive damages are a rare measure, the record is besmirched with serious factual questions that go directly to the training, experience, supervision, thoroughness, and knowledge of both remaining Defendants. That those questions remain in dispute, as commemorated by less than confidence-inspiring deposition testimony, is a troubling facet of this litigation.

For those reasons and in accordance with the discussion that follows, Defendants' motion for partial summary judgment as to Plaintiff's claim for punitive damages is denied.

## II.   LAW

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose."[1] Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[2] "Facts that could alter the outcome are 'material facts,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[3]

"A defendant meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[4] "A plaintiff, on the other hand, must point to admissible evidence that would be sufficient to show all elements of a prima facie case under applicable substantive law."[5]

---

[1]   Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986).

[2]   Fed. R. Civ. P. 56(a).

[3]   Clark v. Modern Grp. Ltd., 9 F.3d 321, 326 (3d Cir. 1993) (Hutchinson, J.) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) and Celotex Corp., 477 U.S. at 322).

[4]   Clark v. Modern Grp. Ltd., 9 F.3d at 326.

[5]   Id.

"[T]he inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."[6] Thus, "[i]f the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."[7] "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."[8] "The judge's inquiry, therefore, unavoidably asks . . . 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'"[9]

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the

---

[6]   Liberty Lobby, Inc., 477 U.S. at 252.

[7]   Id.

[8]   Id.

[9]   Id. (quoting Schuylkill & Dauphin Imp. Co. v. Munson, 81 U.S. 442, 447 (1871)).

absence of a genuine issue of material fact."[10] "[R]egardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."[11]

Where the movant properly supports his motion, the nonmoving party, to avoid summary judgment, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[12] For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed" must be supported by: (i) "citing to particular parts of materials in the record" that go beyond "mere allegations"; (ii) "showing that the materials cited do not establish the absence or presence of a genuine dispute"; or (iii) "showing . . . that an adverse party cannot produce admissible evidence to support the fact."[13]

"When opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would

---

[10]   Celotex Corp., 477 U.S. at 323 (internal quotations omitted).

[11]   Id.

[12]   Liberty Lobby, Inc., 477 U.S. at 250.

[13]   Fed. R. Civ. P. 56(c)(1).

contradict the facts identified by the movant.'"[14] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."[15] On motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record."[16]

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[17] "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[18] "If the evidence is merely colorable . . . or is not significantly probative, summary judgment may be granted."[19]

---

[14]  Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2003) (Weis, J.).

[15]  Fed. R. Civ. P. 56(e)(2).

[16]  Fed. R. Civ. P. 56(c)(3).

[17]  Liberty Lobby, Inc., 477 U.S. at 249.

[18]  Id.

[19]  Id. at 249–50 (internal citations omitted).

### III.   ANALYSIS

In 2005, the Supreme Court of Pennsylvania reiterated the Commonwealth's standard for assessing punitive damages In <u>Hutchison ex rel. Hutchison v. Luddy,</u> In <u>Hutchison</u>, then Chief Justice Ronald D. Castille confirmed that nothing prohibits a plaintiff in a negligence action from "undertaking the additional burden" of showing that punitive damages are warranted.[20] To the contrary, the Supreme Court observed that many of its leading punitive damages decisions involved negligence claims.[21] Speaking to the case's facts, the plaintiff in <u>Hutchison</u> was sexually victimized as a child by a local clergyman.[22] The victim had since argued that the diocese to which the priest belonged should incur punitive damages, on the ground that its negligent supervision of the offender evidenced a reckless disregard for its parishioners' safety.[23] The Supreme Court agreed.

It explained the well-settled standard governing the assessment of punitive damages as follows: "Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to

---

[20]   582 Pa. 114, 125–26.

[21]   <u>Id.</u>

[22]   <u>Id.</u> at 116.

[23]   <u>See id.</u> at 120.

the rights of others."[24] As such, because the aim of punitive damages is the

deterrence of outrageous conduct, proof that the defendant acted with a "malicious,

wanton, reckless, willful, or oppressive" state of mind is "vital" to the plaintiff's

success.[25]

A federal court sitting in diversity must apply state substantive law,[26] and I

have applied the standard from Hutchison, often by direct quotation, in a number

of recent cases involving punitive damages counts in this division of the Court:

- Tucker v. Horn, No. 4:16-CV-0071, 2016 WL 4679018, at *3 (M.D. Pa. Sept. 7, 2016) ("Under Pennsylvania law, punitive damages are only available to compensate 'for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others.'");

- Cerreta v. Red Roof Inns, Inc., No. 4:16-CV-0706, 2016 WL 4611689, at *3 (M.D. Pa. Sept. 6, 2016) (same);

- Flook v. Maxx, No. 4:15-CV-02069, 2016 WL 69619, at *2 (M.D. Pa. Jan. 6, 2016) (same);

- Williams v. Nealis, No. 4:15-CV-01950, 2016 WL 2610029, at *3 (M.D. Pa. May 6, 2016) ("To succeed on a claim for punitive damages under Pennsylvania law, a plaintiff must establish that the defendant's conduct was outrageous because of his or her 'evil motive' or 'reckless indifference to the rights of others.'");

- Fassett v. Sears Holdings Corp., No. 4:15-CV-00941, 2015 WL 5093397, at *3 (M.D. Pa. Aug. 28, 2015) ("[I]t is true that punitive damages are

---

[24] Id. at 121 (quoting Feld v. Merriam, 506 Pa. 383 (1984)).

[25] Feld, 506 Pa. at 395–96 (internal quotation marks omitted).

[26] See Chamberlain v. Giampapa, 210 F.3d 154, 158 (3d Cir. 2000) (citing Erie R.R. v. Tompkins, 304 U.S. 64 (1938)).

warranted only for 'behavior which is willful, malicious, or so careless as to indicate wanton disregard for the rights of the parties injured.'");

- <u>Russell v. Chesapeake Appalachia, L.L.C.</u>, No. 4:14-CV-00148, 2014 WL 6634892, at *2 (M.D. Pa. Nov. 21, 2014) ("To establish a punitive damages claim, 'the state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless or malicious.'").

In fact, a recent search reveals that the judges of this Court have cited the <u>Hutchison</u> case at least seventy-five times since its publication.

Applying that guidance here, I note that the case presently before the Court does not involve willful or malicious conduct—either of which would command a more straightforward outcome. As far as discovery has revealed, no one intentionally meddled with Mr. Wilson's brakes, hoping that calamity would ensue. No one disputes that. Still, under <u>Hutchison</u> and its progeny, the Plaintiff may nevertheless prevail at this juncture if the Defendants actions or inactions evidence a reckless disregard for Mr. Wilson's safety.[27] This motion thus turns on a singular question: was the Defendants' repair of Mr. Wilson's vehicle reckless? As it turns out, however, such a narrow construction is deceptively simple.

Scholars have termed recklessness "one of the most poorly understood" and "one of the murkiest standards in tort."[28] The Supreme Court of the United States, for instance, has described incremental levels of culpability between negligence

---

[27] <u>Hutchison</u>, 582 Pa. at 122.

[28] <u>See, e.g.</u>, Geoffrey Christopher Rapp, <u>The Wreckage of Recklessness</u>, 86 Wash. U.L. Rev. 111, 115 (2008).

and intent, such as deliberate indifference, recklessness, or gross negligence, as "nebulous."[29] And other federal courts, too, have described the boundaries between such descriptors as gross negligence and recklessness as "amorphous."[30] Consequently and in an attempt to clarify this ambiguity, the Supreme Court of Pennsylvania also explained in <u>Hutchison</u> that a punitive damages claim premised upon reckless indifference may succeed if the plaintiff satisfies two conditions: first, that "a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed," and second, that "he acted, or failed to act, as the case may be, in conscious disregard of that risk."[31]

From the outset, one thing is certain: the two factors enumerated by Pennsylvania's highest court certainly contemplate a fact-intensive inquiry. Whether a defendant "subjectively appreciated" and "consciously disregarded" any risk of harm are both undoubtedly questions that depend on the nuanced circumstances of each case. A court's job would be much different if mere negligence or blatant malice were evident, but searching for facts to establish "reckless indifference" presents a much more complicated set of circumstances— perhaps one best suited for a jury's determination.

---

[29]   <u>Farmer v. Brennan</u>, 511 U.S. 825, 836 n.4 (1994).

[30]   <u>Torres Ramirez v. Bermudez Garcia</u>, 898 F.2d 224, 227 (1st Cir. 1990).

[31]   <u>Id.</u> at 124 (citing <u>Martin v. Johns-Manville Corp.</u>, 508 Pa. 154 (1985) (plurality opinion)).

As the United States Court of Appeals for the Third Circuit has advised, "a court should be reluctant to grant a motion for summary judgment when resolution of the dispositive issue requires a determination of state of mind, for in such cases much depends upon the credibility of witnesses testifying as to their own states of mind, and assessing credibility is a delicate matter best left to the fact finder."[32] By extension, the Honorable Sylvia H. Rambo of this Court has explained, this is particularly apt advice "when a dispositive issue requires a determination of a party's state of mind."[33]

The case law frequently reinforces this advice when the recklessness of an actor is at issue: "[R]ecklessness usually presents questions of fact unsuitable for summary judgment unless no reasonable mind can differ as to the conclusion."[34] "Viewing the record in a light most favorable to Plaintiff, a question of fact therefore remains as to whether Defendant's action rose to the level of recklessness."[35] "Because there are questions of material fact regarding whether

---

[32] Norfolk S. Ry. Co. v. Basell USA Inc., 512 F.3d 86, 96 (3d Cir. 2008) (quoting Metzger v. Osbeck, 841 F.2d 518, 521 (3d Cir.1988)).

[33] Stemrich v. Zabiyaka, No. 1:12-CV-1409, 2014 WL 670919, at *3 (M.D. Pa. Feb. 21, 2014).

[34] Crockford v. Spencer, No. 3:10CV813 HBF, 2012 WL 370187, at *2 (D. Conn. Feb. 3, 2012).

[35] Melendez v. Happy Trails & Riding Ctr., Inc., No. 3:14-CV-1894, 2016 WL 5402745, at *7 (M.D. Pa. Sept. 26, 2016) (Mariani, J.).

[the Defendant] was acting in a reckless manner at the time of the collision, the Motion for Partial Summary Judgment will be denied."[36]

I do not mean to convey that an issue involving recklessness can never appropriately be disposed of at the summary judgment stage. That is plainly an overstatement. For instances, could the facts in a case's record, taken together, only ever rise to the level of mere negligence, then summary judgment would be appropriate there as a matter of law. So, the central question here really is whether a reasonable jury, after considering all of the facts and circumstances, could determine that the Defendants acted recklessly? In light of the evidence to which I now turn, I believe that such a jury could decide as much, and therefore, partial summary judgment as to the Plaintiff's punitive damages claim must be denied.

The law is replete with examples of courts in states with similar standards for assessing punitive damages as Pennsylvania allowing claims involving faulty automotive repair to be decided by a jury. In Nichols v. Baker, for example, the Supreme Court of Arizona refused to disturb a jury verdict that had found that a commercial trucking company acted "wantonly" when it failed to properly repair brakes on one of its trucks.[37] The faulty brakes ultimately required the drive (the plaintiff in Nichols) to jump from the truck when it failed to negotiate a curve at

---

[36] Arias v. Decker Transp., No. CIV.A. 3:06-CV-638, 2008 WL 450435, at *1 (M.D. Pa. Feb. 14, 2008) (Caputo, J.).

[37] 101 Ariz. 151, 152, 416 P.2d 584, 585 (1966).

the bottom of a steep hill.[38] Two months prior to the accident, another driver had told the truck's prior owner (the defendant in <u>Nichols</u>) that the brakes had failed, but he declined to have the brakes adequately repaired.[39] Such facts sufficiently supported the conclusion that the prior owner's inaction "not only creates an unreasonable risk of bodily harm to the plaintiff but also involves a high degree of probability that substantial harm will result."[40]

Again, in <u>Goff v. Lubbock Building Products</u>, the Texas Court of Appeals, the state's intermediary court, upheld a jury verdict awarding enhanced damages against a building products company that failed to adequately maintain the brakes on one of its trucks.[41] The defective brakes were a primary factor in an automobile collision that killed a passenger in another vehicle.[42] Despite its knowledge of the truck's brake problems, the company failed to adequately repair them and assigned a young, inexperienced driver to operate the truck on the day of the accident.[43] According to the <u>Goff</u> court, that was sufficient to show that the trucking company acted with a "conscious indifference of the rights or welfare of others." [44]

---

[38] <u>Id.</u>

[39] <u>Id.</u> at 153.

[40] <u>Id.</u>

[41] 267 S.W.2d 201, 206 (Tex. Civ. App. 1953).

[42] <u>Id.</u> at 201–02.

[43] <u>Id.</u> at 202.

[44] <u>Id.</u> at 206.

Federal courts have similarly recognized that botched automotive repairs may rise to the level of recklessness. In <u>Burrows v. Core-Mark International, Inc.</u>, for example, the United States Court of Appeals for the Ninth Circuit upheld a jury award of punitive against a delivery truck company.[45] The plaintiff, who was the victim of a motor vehicle accident caused by one of the defendant's delivery trucks, alleged that the company failed to notice and repair the defective brakes.[46] The employee who was required by law to perform a pre-trip inspection testified that he could not recall completing it.[47] Likewise, the court considered that the brakes were out of adjustment immediately following the accident constituted circumstantial evidence of inadequate inspection.[48] Thus, the court concluded that there was sufficient evidence in the record that would enable a reasonable jury to conclude that the defendants acted wantonly or with deliberate indifference.[49]

In addition, the United States Court of Appeals for the Fourth Circuit made the following relevant observation in a case involving claims similar to the ones at bar:

> The analogy can be drawn to a mechanic who fails to test the brakes on a car. Assuming that the examination should have been conducted, the mechanic is negligent but not liable for punitive damages <u>unless it</u>

---

[45]   1995 WL 275927 (9th Cir. 1995).

[46]   <u>Id.</u> at *1.

[47]   <u>Id.</u> at *4.

[48]   <u>Id.</u>

[49]   <u>Id.</u>

can be shown that he or she knew or had reason to know that the brakes were faulty and thus a substantial likelihood existed that the brakes would fail and result in great bodily harm.[50]

In another case, the United States District Court for the District of Kansas permitted a punitive damages claim to reach the jury where a highway accident was caused by a lost tire. In Simpson v. Bridgestone/Firestone, Inc., the plaintiff's left front tire and rim came loose and fell off his vehicle just six days after it had been serviced at the defendant's shop.[51] The mechanic who worked on plaintiff's vehicle did not certify on the service ticket that the lug nuts had been securely tightened to manufacturer specifications.[52] In addition, even though a test drive was required by the defendant's service manual in all instances where a tire was removed during repair, a test drive was not taken.[53] The mechanic in question had only been working for defendant for two weeks, he had no prior automotive experience, and he was eventually terminated for unsatisfactory performance.[54]

Ultimately, the court concluded that summary judgment was inappropriate as to the punitive damage issue to the extent that defendant could be construed as having authorized the mechanic's conduct.[55] The court noted that "there is some

---

[50] Mosser v. Fruehauf Corp., 940 F.2d 77, 87 (4th Cir. 1991) (emphasis added).

[51] No. 93-2082-JWL, 1994 WL 171680, at *1 (D. Kan. Apr. 5, 1994).

[52] Id.

[53] Id.

[54] Id. at *2.

[55] Id. at *3.

evidence that the company and its managing agents knew or should have known that [the mechanic] and other employees were not following certain company procedures which were designed to prevent wheel-offs and insure that tire rotations were performed properly."[56] The court noted that "[t]here is also evidence that the failure to comply with certain procedures is causally related to [the motorist's] injuries."[57]

While the facts in the present case certainly do not reveal evidence of malicious intent, they are not so innocuous as to mandate a grant of summary judgment. To the contrary, whether punitive damages are warranted here depends on several disputed factual issues as to training, experience, and supervision, which are properly reserved to the jury.

From the outset, Defendant Treston Wesley Harris's testimony was less than reassuring:

> Q.    Okay. So which did you believe was the problem, the parking brake or the brakes when you pressed the pedal?
>
> A.    Why would it be parking brake if I took the line off the other one? I took the line off the service side. That's the pedal part. Not the button parking brake part.
>
> Q.    Okay. Well, didn't you replace the spring brake valve?
>
> A.    Yes.

---

[56] Id.

[57] Id.

16

Q.      Isn't that the parking brake?

A.      No, it's the valve.

Q.      Okay. So the spring brake valve is not part of the parking brake?

A.      I have no idea.

Q.      Okay.

A.      You are getting me all confused here, buddy.

Q.      Well, what did you replace?

A.      I replaced the spring brake valve. It says right there on the work order.

Q.      I know. Isn't that part of the parking brake? Do you know— do you know—

A.      No.

Q.      If that's part of the parking brake?

A.      No.

Q.      Wasn't that something you think would be important to know when you're making repairs on someone's brakes, whether or not you're repairing the parking brake or the brake when you pushed the pedal?

A.      I was working with a tech.

Q.      I asked you if you thought that was important for you to know.

A.      Yeah, I'm sure I would have asked the question because I was working with the tech.

Q.      You sure that you would have asked the question, am I replacing a part for the parking brake or am I replacing the part

for the brakes for the pedals; do you think you asked that question?

A.     I don't know. Sir, this shit was four years ago.[58]

Importantly, the record calls into the question the source and extent of Mr. Harris's experience and training as to brake repairs. Mr. Harris attended school until at least the eleventh grade and later obtained his GED.[59] He testified that he had never worked on tractor trailers prior to starting at TA Operating in July 2010 at age 25.[60]

Despite being elevated in rank to a "Tech 2" in February 2011, Mr. Harris did not receive the prescribed brake training that would typically have attended such an advancement. In fact, he had not even participated in that training course prior to working on Wilson's brakes eight months later.[61] When asked why Mr. Harris did not receive the training in a timely fashion, Donald Nyman, Jr., the shop's general manager answered, "I didn't really look at it. I didn't know the time frame exactly."[62]

The countervailing argument is that Mr. Harris received some level of supervision from Mr. Garbrick, the supervisory mechanic at TA Operating's

---

[58]   ECF No. 152 Ex. 2, Harris Dep. 95:13–97:03.

[59]   ECF No. 152 Ex. 2, Harris Dep. 08:15–19; 10:13–15; 35:11–13.

[60]   Id. at 07:11–12.

[61]   ECF No. 152 Ex. E, Nyman Dep. 19:14–23:06. Harris Dep. 59:14–60:07.

[62]   Nyman Dep. 20:21–21:01.

Lamar site on the date in question, to accommodate for his lack of experience and training. However, the extent of that supervision is a highly contested factual matter, as evidenced by the following exchange during Mr. Garbrick's deposition:

> Q.   Approximately how much time did you spend with Treston Harris, either advising him or doing work related to Treston Harris—or, excuse me, Jerry Wilsons's vehicle?
>
> A.   I don't remember.
>
> Q.   Was it a minute, was it an hour can you give me any idea?
>
> A.   I can guess.
>
> Q.   No, I don't want you to guess.
>
> A.   Estimate?
>
> Q.   Well, can you, is there any way in [ ] looking at your written document that you signed, you hand wrote, I assume that's your handwriting; is that correct?
>
> A.   Yes.
>
> Q.   And that's your signature?
>
> A.   Yes.
>
>      . . .
>
> Q.   Does that tell you by looking at that, your description, approximately how much time you think you spent with Treston on Jerry Wilson's vehicle?
>
> A.   I don't think I can be very accurate.
>
>      . . .

Q.     Okay. Sounds like he was—when the two of you were together, he just moved some air lines and that's about it. I mean, it sounds like you weren't with him very long. I mean, is that accurate or no?

[Counsel rephrases question following objection. No answer supplied in the transcript.]

Q.     I mean based on this, you don't have a very detailed description as to the work that he performed. So your handwritten—what was the purpose of this handwritten note that you signed?

A.     My employer required it.

Q.     And did he tell you to document everything that you recalled, you observed Treston Harris do?

A.     No.

Q.     Okay. Well what did he tell you to do?

A.     Just write down what happened.

Q.     And he left it up to you how detailed you wanted to be?

A.     I never wrote a statement before.

Q.     Okay. Well, did he tell you to put down everything that is important, that you thought was important?

A.     Yes.

Q.     And is that what you tried to do?

A.     Yes.

Q.     And what you thought was important are the things that you personally observed or that he asked you about; is that fair?

A.     Yes.

Q.    Can you read this for the record, please? Or I'll read it, you are having trouble with your eyes. I can read it for you, unless you are having trouble.

[The following is read from a document at this point in the deposition:]

"On October 17, 2011, Treston asked me to help him with a brake problem on the trailer. Front axle brakes would not release."

Q.    Do you know if it was the left or the right?

A.    I remember the front. I remember the axle on both sides.

Q.    I'm sorry can you say that—

A.    Both sides.

Q.    Both sides of the axle, so the left and the right or [ ] just the left?

A.    Both sides.

Q.    Left and the right?

A.    Uh-huh.

Q.    There were problems with both?

A.    Yeah. Well, the driver had both backed off, had both slack adjusters backed off.

Q.    Okay.

A.    So I though both sides had, you know, was the problem.

Q.    Okay. Did you see any evidence of a fire?

A.    I don't.

Q.     What does that mean, "I don't"?

A.     I—I—

Q.     You don't recall or you didn't see any evidence of a fire or—

A.     I can't recall.

Q.     Okay.

A.     I wasn't—

Q.     So are you aware that he purchased a fire extinguisher at TA?

A.     The driver?

Q.     Yes.

A.     No.

Q.     Are you aware that he had a spent fire extinguisher?

A.     No.

Q.     Did you see any evidence of, I don't know what you call it, the chemical that sprayed from the fire extinguisher, did you see any evidence of that on the trailer?

A.     I don't recall.

Q.     Did you see Jerry Wilson?

A.     I seen him walk to his truck through the bay when he was leaving after the bill was paid.

Q.     Is that the only time you saw him?

A.     Yes.

Q.     And did you talk to him at all?

A.    No.[63]

Later on, the pair discussed the specifics of the contested supervision as follows:

Q.    As you sit here today, do you recall watching Treston do any diagnostic with respect to evaluating the problem that Jerry Wilson reported on October 17, 2011?

A.    I was underneath the trailer with him to point out the spring brake valve and to point out the air lines, the chambers.

Q.    Okay.

A.    And that's all I can remember.

Q.    Okay. And do you know what he had done before he did that?

A.    I believe he had the wheels off, the brake drum was off, and that's all I can remember.

Q.    So did you physically see the brake drum off the brake or off the axle?

A.    To the best of my knowledge, I believe the brake drum was right in front of the axle.

Q.    Okay. And are we talking about the left front axle or the right front axle?

A.    Left front axle.

Q.    And did he have all four tries off the left front axle?

A.    No.

Q.    Was it, which tires did he have off? You said he had tires off?

A.    The left front axle.

---

[63]    Id. at 36:04–40:17.

Q.     The left front?

A.     Uh-huh.

Q.     Both tires?

A.     Yes.

Q.     Okay. You said you pointed out the air spring valve to him?

A.     Yes.

Q.     Did he know where it was before you pointed it out?

A.     He knew it was on the tank, and I pointed it out with helping him remove the lines, because I remember saying, see how this line goes to this valve and this valve, and this is the spring brake valve.

Q.     Okay. And then after you did that, did you leave?

A.     Yes.

Q.     And so the repair work and the hooking up of the lines again was done with, what, while you were away; is that correct?

A.     Yes.

Q.     Now, you say, [counsel reading from document:] "Treston replaced valve, and brakes worked on the front axle." Is that from what Treston told you, that he replaced the valve, and the brakes worked okay?

A.     Yes, and watching the vehicle leave.

Q.     Right.

A.     After the bill was paid.

Q. You didn't witness anyone activating the brakes, and seeing if the slack adjuster worked or what the [stroke] of it was, right?

A. Correct.[64]

Further deposition testimony reveals continued discrepancies as to whether certain repairs were made or whether adequate safeguards were put in place:

Q. Do you know if anyone checked to see if there was air leaking from either of the front brake chambers?

A. Yes.

Q. Who did that?

A. Treston and I.

Q. Okay. And was there any air leaking?

A. No.

Q. And how did you do that?

A. Usually, if a Maxi chamber is leaking air, it's audible. You can hear it.

Q. Okay. Did anyone check to verify that the blue service and red emergency lines at the front of the semi trailer were attached to their respective glad hands?

A. I don't know.

Q. Okay. Is that something that should have been done?

A. Yes.

---

[64] Id. at 47:01–49:07.

Q.   Before removing the spring brake valve, did anyone verify that the air plumbing attached to the valve was properly routed?

A.   Yes.

Q.   Who did that?

A.   Me.

Q.   And how did you do that?

A.   Traced the lines to the respective areas to the Maxi chamber.

Q.   Was any inspection made of the brake shoes in light of the fact that the driver had reported there being a fire?

A.   I don't know.

Q.   Should that have been done?

A.   Yes.

Q.   Did anyone check the clearance of the shoes to the drum after the tires and the brakes had been reassembled?

A.   I didn't.

Q.   Okay. Should that have been done?

A.   Yes.

Q.   And I believe your testimony earlier was that the driver had the brakes backed off on both the left front axle and the right front axle, correct?

A.   Correct.

Q.   Did you actually witness that or did Treston tell you that?

A.    Treston told me that.[65]

In my view, this same conclusion holds true not only as to Plaintiff's claim for punitive damages against Mr. Harris, but also her claim against TA Operating on the basis of vicarious liability. "The Third Circuit Court of Appeals has explained that, under Pennsylvania law, a principal may be held vicariously liable for punitive damages if the actions of its agent (1) were clearly outrageous, (2) were committed during and within the scope of the agent's duties, and (3) were done with the intent to further the principal's interests.[66] "Vicarious liability for punitive damages may be imposed even in situations where the principal has neither directed nor ratified the acts of its agents."[67]

Moreover, even though the Supreme Court of Pennsylvania has suggested that courts use "great caution" in vicarious punitive damages situations, the "clearly outrageous" requirement "merely reiterates Pennsylvania's already high punitive damages standard and does not create a second, higher threshold for

---

[65]  Id. at 50:01–51:22.

[66]  Achey v. Crete Carrier Corp., No. 07-CV-3592, 2009 WL 9083282, at *10 (E.D. Pa. Mar. 30, 2009) (citing Loughman v. Consol–Pennsylvania Coal Co., 6 F.3d 88, 101 (3d Cir.1993)).

[67]  Achey, 2009 WL 9083282, at *10 (citing Shiner v. Moriarty, 706 A.2d 1228, 1240 (Pa.Super.Ct.1998)).

vicarious punitive liability."[68] "[T]he standard for both direct and vicarious liability for punitive damages is ordinary outrageousness."[69]

For instance, the record also reveals the following exchange between counsel for Plaintiff and Mr. Garbrick, which, like many of the excerpts recounted above, goes directly to the company's supervision and training of Mr. Harris:

> Q.  So if a fire occurs, would you expect that the work order would indicate, fire occurred or, you know, describe the incident, check all component parts, working fine, if that was the case?
>
> A.  Yes.
>
> Q.  Would that be consistent with the instructions that you would have given to Treston Harris on how to complete a work order?
>
> A.  Yes.
>
> Q.  So the fact that he did not put that in the work order, does that lead [you] to believe that he didn't check all the component parts?
>
> A.  Yes.
>
> Q.  Do you make decisions whether to fire people?
>
> A.  No.
>
> Q.  Do you give recommendations on whether a mechanic is competent or not?
>
> A.  No.

---

[68]  Achey,  2009 WL 9083282, at *10 (citing Gregory v. Sewell, No. 4:CV-04-2438, 2006 WL 2707405, at *4 (M.D. Pa. Sept. 19, 2006) (Jones, J.)).

[69]  Gregory,  2006 WL 2707405, at *11.

Q.      So you train the mechanics but you don't comment to your boss
        as to whether or not they're capable of doing their job?

A.      When you put it that way, yes.

Q.      Okay. Well based on what I brought to your attention now, if
        you came to the realization that this isn't documented in the
        work order, would you recommend that he be terminated to
        your boss?

A.      No.

Q.      Would you recommend he be retrained?

A.      Yes.

Q.      Would you recommend that he not be allowed to work on
        brakes until he's retrained?

A.      Yes.

Q.      Is that because if you don't check all the necessary component
        parts for [the] braking system, it could lead to a serious injury
        or death for the driver or other people on the road?

A.      Yes.

Q.      Would you agree with me, besides the steering wheel, the
        braking system is probably the most important part of the trailer
        and the tractor?

A.      Yes.

Q.      Did anyone ask you to check his knowledge or expertise after
        this incident happened?

A.      No.

Q.      Did he just go back to servicing trailer brakes after this
        incident?

A.      I can't recall.

Q.     Are you aware of anything that TA did to double-check that Treston Harris knew what he was doing?

A.     I'm not—I don't remember.

Q.     Based on what I've shown you today and seeing the invoice and the complaints, do you believe that Treston Harris had the necessary skill and experience to work on these trailer brakes?

A.     I think he had. If he would have run into any kind of problems, he could have, you know, he came to me and, you know, as far as, you know, what to do.

Q.     Okay. If you're recommending that he needs to be retrained, that suggests to me that he needs to be retrained on how to do certain things the right way, that he doesn't have the experience or the knowledge to do things correctly, correct?

A.     Correct.

Q.     Okay. So based on these documents that I've shown you, would you agree with me that he didn't have the expertise or the experience to service the brakes, service Jerry Wilson's brakes?

A.     Not by himself.[70]

Again, Mr. Garbrick admitted the following in a separate exchange:

Q.     Would it be a concern of yours if I were to tell you that Treston Harris looked at his work order and he couldn't tell me whether or not he repaired the parking brake or the press pedal brake?

A.     Yeah. Yeah, it would concern me.

       . . .

Q.     Can you tell me if he replaced the parking brake valve or if he replaced a valve related to the press pedal?

---

[70]   ECF No. 152 Ex. 1, Garbrick Dep. 30:07–33:02.

A.     He replaced the spring brake valve.

Q.     Is that part of the parking brake system?

A.     Yes.

        . . .

Q.     Would you expect Treston Harris to know that the spring brake
       valve is part of the parking brake system?

A.     Yes.

Q.     I mean, isn't that basic knowledge?

A.     Yes.

Q.     And if I were to represent to you that he had no idea if [it] was
       part of [the] parking brake or the press pedal brake, would that
       indicate to you that maybe he's incompetent, or he lacks the
       experience necessary to work on the brakes?

A.     Yes.[71]

In addition to the above testimony, a thorough report by Plaintiff's expert,

David F. Welker, recounts the same. Mr. Welker is a licensed professional

engineer by examination and possesses a degree in mechanical engineering. Mr.

Welker opines that Mr. Harris was "inadequately trained" to service a system "as

complex as truck semi-trailer brakes" and that TA Operating "had no formal

procedure in place for training recently hired mechanics."[72] In fact, the report

---

[71]   Id. at 34:13–36:03.

[72]   ECF No. 141 Ex. 1 at 158.

emphasizes that Mr. Harris was not directed to take the brake training course until after Mr. Wilson's death.[73]

Mr. Welker's report also indicates that there were at least two other ways to the test the trailer's brakes after repair absent driving it.[74] The Defendants here elected not to perform a test drive because no one at the garage possessed a commercial driver's license (CDL).[75] Nevertheless, the first method involved a commercially available testing device known as a dynamometer.[76] The second method would have been to raise the rear axles off the ground and increase the vehicle's RPMs to a reasonable range before applying the brakes.[77] According to Mr. Welker, this second test would have likely revealed that the overheating problem still existed and that the braking system still was not roadworthy.[78] Nothing in the record indicates that either of these tests was performed.

Lastly, I note that a key driver for the imposition of punitive damages is deterrence. It is said that actors who do not possess one of the requisite states of mind enumerated earlier cannot be deterred, thereby making the imposition of punitive damages in such cases futile. That is likely not of concern here. Rather,

---

[73] Id.

[74] Id. at 157.

[75] Garbrick Dep. 40:25–42:20.

[76] ECF No. 141 Ex. 1 at 157.

[77] Id.

[78] Id.

the testimony cited above evidences that significant questions of fact exist as to whether the Defendants action or inaction constituted reckless indifference for the wellbeing of the Plaintiff's decedent. Were such recklessness present, the imposition of punitive damages is appropriate to deter similar conduct in the future as to these defendants and others similarly situated.

## IV.  CONCLUSION

Consistent with the foregoing reasoning, genuine issues of material fact remain as to whether Defendants' conduct warrants the imposition of punitive damages. Accordingly, their motion for partial summary judgment is denied.

An appropriate Order follows.


BY THE COURT:


s/ Matthew W. Brann
Matthew W. Brann
United States District Judge